[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The issue in this real estate tax appeal is the value of the subject property as of the revaluation date of October 1, 1988.
The subject property, known as Ocean Reef, is a one hundred sixty-three unit apartment complex containing eight building clusters located on both sides of Nob Hill Road in the City of New London. The complex sits on 7.67 acres of land and consists of eight efficiencies, fifty-four one-bedroom units, ninety-one two-bedroom units, and ten two-bedroom townhouses.[1]
On September 25, 1986, New London-Ocean Reef Limited Partnership purchased the subject property for $6,764,500 from PIP/Realvest Properties I Limited Partnership. Subsequent to the purchase, New London-Ocean Reef filed a declaration to treat the subject as a condominium development. Although New London-Ocean Reef spent over $280,000 to renovate and upgrade the proposed condominium development, no units were sold as condominiums as of October 1, 1988. At the time of the city-wide revaluation on October 1, 1988, the subject property was still declared as a condominium development. New London-Ocean Reef terminated the condominium declaration in September 1989, almost one year after the revaluation date.
On July 31, 1992, GTT Corporation acquired the subject property through foreclosure from New London-Ocean Reef. The present plaintiff, Shoreline London Associates Limited Partnership, purchased the subject property from GTT Corporation CT Page 14000 on October 1, 1992 for $3,025,000.
Ocean Reef is located on the southern edge of New London in a predominantly single family residential area with some apartments. A park is located across the street from Ocean Reef containing such amenities as tennis courts. Ocean Reef itself has no such amenities. Ocean Reef is located behind Ocean Avenue on a cul-de-sac and is within two miles of Ocean Beach, a municipal beach.
From 1980 through 1988 there was a strong demand for apartment units that could be converted to condominiums. For this reason the going rate for the purchase of apartments was higher than normal apartment house prices if the apartment units could be converted into condominiums. In the mid-eighties, rents for apartments were rising at the rate of 20% per year. Purchasers of apartment buildings tended to pay more because of the rising income. Condominium conversions were removing rental units from the market, thereby increasing the demand for rental units. In the summer of 1988, apartment building purchases were at the peak of the market. In 1988 most apartment buildings were at 95% to 100% occupancy. The average overall market vacancy rate was 3%. On October 1, 1988, the prognosis for the future apartment market was excellent since apartment building sales were at their all-time high. For this reason, rentals coming due in 1988 were renewed at a higher rental rate.
In the spring of 1989, the apartment market was at a plateau. By January of 1990, the bottom had fallen out of the apartment market.
We are required to look at the value of the subject property as of October 1, 1988, when the apartment market was strong, not when the market was weak in the early 1990s. Ralston-Purina v.Board of Tax Review, 203 Conn. 425, 437-38, 525 A.2d 91 (1987).
The plaintiff's appraiser, Christopher A. Miner, determined that the highest and best use of the subject property on October 1, 1988, was for apartment use. Using the income approach as his primary method to arrive at value, Miner found the fair market value of the subject property on the revaluation date to be $5,750,000.
The defendant's appraiser, Robert J. Flanagan, also concluded that the highest and best use of the subject property was for CT Page 14001 apartment use on October 1, 1988. Flanagan also relied on the income approach as his primary method to establish value. Flanagan found that the fair market value of the subject property as of the revaluation date was $7,385,000.
We consider it inappropriate to use either appraiser's valuation based on the income approach. In using the income approach, both appraisers determined the gross income based upon incorrect types of units. Miner used fifty-seven one-bedroom units when the actual number was fifty-four. Flanagan used fifty-two one-bedroom units. Miner used eighty-six two-bedroom units when the actual number, as used by Flanagan, was ninety-one two-bedroom units. Both Miner and Flanagan used twelve townhouse units when the actual number was ten. For computing the gross income of the subject, Miner excluded the income from a two-bedroom unit used by the owner as an office. We agree with Flanagan's opinion that the choice of whether to use a rental unit for income or for an office is the owner's choice, not the way the market behaves, which is to include the office as a rentable unit.
In determining the value of the subject property, we deem it appropriate to look at the comparable sales approach used by both Miner and Flanagan to support their primary method, which was the income approach. Both appraisers have provided the court with sufficient comparable sales to make a finding of value on October 1, 1988. of the four comparable sales used by Miner, sale number 2 is reasonably comparable to the subject. Sale 2, known as Bishop Court apartments, is a one hundred six unit apartment complex located in Groton. The sale price on January 22, 1988, was $3,900,000, or $36,792 per unit. Bishop Court contained fifty one-bedroom units and fifty-six two-bedroom units. The units are contained in nine two-story frame buildings on 7.6 acres of land. Bishop Court was in poor condition, causing the units to be rented at lower than market levels and with a higher than typical vacancy. At the time of sale the units at Bishop Court rented between $375 to $450 per month. Miner adjusted sale 2, basically for location and inferior condition, to arrive at a per unit price of $37,042.
Other comparable sales used by Miner were not really comparable in that they were much smaller than the subject property. Sale 1, in Groton was a twenty-four unit apartment complex located on 1.53 acres. Sale 3, in Groton, was a thirty-three unit apartment complex located on 3.68 acres of CT Page 14002 land. Sale 4 was an eighteen unit apartment complex located in New London. Of the eighteen units, sixteen were efficiency units and two were one-bedroom units. This complex was located on .28 acres of land.
Flanagan used seven sales to develop valuation using the comparable sales approach. Of the seven sales selected by Flanagan, we find sale 1, a 114 unit apartment complex located in Montville, and sale 5, a 136 unit complex located in New London, to be credible comparable sales. Sale 1 was purchased for its continued use as an apartment complex. Sale 5 was purchased for condominium conversion. Flanagan adjusted sales 1 and 5 primarily for location and condition. Flanagan also adjusted sale 5 downward by 15% to recognized the purchase motive of condominium conversion. Flanagan's final fully adjusted sale price of sale 1 was $47,365 per unit and sale 5 was $44,447 per unit.
We find it credible to use Miner's sale 2 and Flanagan's sales 1 and 5 to arrive at a per apartment unit price of $43,000. This general unit price takes into account the varying sizes of the units at Ocean Reef. Given a per unit apartment value of $43,000, with 163 rental units in the subject property, we find the fair market value of the subject property on October 1, 1988 to be $7,009,000.
The town's valuation of the subject property as of October 1, 1988, was $7,304,000. We find that the subject property was overvalued by $295,000 on the grand list of October 1, 1988.
Judgment may enter in favor of the plaintiff without costs to either party. The assessor is ordered to adjust the assessed value of the property to reflect a fair market value of $7,009,000 on the grand lists beginning on October 1, 1992, and continuing to the next revaluation.
Arnold W. Aronson Judge Trial Referee